Your Honor, I would ask to reserve 10 minutes for rebuttal in this case. You'll have to keep track of your time as well. Thank you. In this case, it basically boils down to strategy of trial attorneys versus the emotional impact on the jury. In this case, what we have is a conference with Judge Blaine where he specifically laid out what parties were and were not to talk about, especially specifically with regard to the nature of the crime. The plaintiff had been accused of which in this case was probably under restraint. Mr. Glass, very carefully in his opening statement, followed the judge's instructions, anticipating that defense counsel was going to speak about what was happening in the case with regard to the alleged person who accused the plaintiff of the violation of restraining order without mentioning the violation of the restraining order. And knowing that he could impeach her on that and knowing that defense counsel intended to offer that, when defense counsel finally did his opening statement, he offered the fact that this was a court-ordered violation of a restraining order. And in that one moment, he undid all the pre-trial work that parties had tried to keep the case focused on the issue of force. And instead what it opened up was the character of the plaintiff. And by doing that, the court, instead of overruling defense counsel, the court just admonished him and, yeah, I mean, instead of sustaining the objection, overruled the plaintiff's objection. And by doing that, the plaintiff then was forced to be in a position where he had to undo the damage that was done and then spoke about the restraining order in different places, believing that he would be able to undo the damage when he was finally able to do his cross-examination, either through the deposition or through the witness. What ended up occurring, and I won't go through all the facts and details, is that there was a very strategic effort to keep the witness from testifying so that she couldn't be cross-examined. Counsel, let me first ask you about the first piece before we get to the witness. Mr. Conaway testified himself in his description of what had happened, that he was placed under arrest for a violation of a restraining order. And by raising that himself in his own testimony, why doesn't that open the door to an explanation of what that restraining order was or at least permit what statements came in? What ended up, to answer the court's question, what ended up happening was that the court overruled Mr. Glass's objection. And then the fact that a violation of a restraining order occurred was now in play, basically. And the mentioning of it was not anything new to the jury. In fact, not mentioning it would seem very bizarre to a jury and trying to hide that fact and hide that matter now that the jury had that information. That bell could not be unrung. And I believe that the court took out that that bell could not be unrung. Your problem now is that the Supreme Court is saying that if it is a case involving a sentencing force, that it is appropriate to state what the otherwise fine was, the reason for the arrest, so it's appropriate to not state that initially. The problem is that it was a false accusation. And to be able to bring that in, the court appropriately initially ruled that Mr. Glass would have the opportunity to cross-examine to show that that was a false accusation. And that was a very important fact in terms of the character development of the plaintiff. The defense counsel put extreme focus on the character of the plaintiff. And without being able to explain that, then plaintiff's counsel was put in the position that you basically have a bad guy here. You were given an opportunity to call a witness, as a house of witness, and you said you didn't want to do that. I'm sorry, I couldn't hear that. You were given an opportunity to call a witness, as a house of witness, to call Nelson as a house of witness, and you declined to do that. The judge gave you that opportunity. The judge actually, that was a very long and involved area of my brief. But in a really brief sense, Mr. Glass did do his utmost. He basically got that witness, found that witness, and then the road conditions did not allow it. The court stated that it did not believe that phone testimony would be of any use whatsoever. And the court finally came down in the end to say that Mr. Glass would not be able to impeach that witness because of the fact that he now found that matter collateral. Whereas in the beginning of the case, when Mr. Glass was relying upon the court's initial judgment, the court was not finding that impeachment collateral. And so what ended up happening is the court finally, in the end of that conversation, the sum total of it was even if the court stopped the proceedings to have that witness, the court was not allowing that impeachment in. Therefore, there was no reason at that point to call the witness. Well, what I'm saying is that you were asking the question, Your Honor, and with all due respect, you were asking the question of the court giving Mr. Glass the opportunity to call that witness. And in fact, Mr. Glass was finally given the opportunity to call that witness. But then at that point, the court had ruled that he could not impeach that witness over the matter that was with regard to the violation of the restraining order. And so at that point, it had become moot. The court had reversed its decision. Thank you. You will have about six and a half minutes, it looks like, for rebuttal if you'd like to use it. Mr. Mallory? May it please the Court, I'm Bruce Mallory. I represent defendants, Baker County defendants. The real question is did the plaintiffs receive a fair trial, and the answer is yes. And putting aside comments made on opening statements and so on, Mr. Conaway was always going to lose. He was never going to win for this reason. This was an April 5, 1998 arrest incident with my client. Saw his own family doctor within three weeks and said nothing about the incident, said nothing about injuries sustained in the incident, attributed his aches and pains to a 1994 automobile accident, and said nothing about the right pectoral atrophy. His family doctor referred him to a neurologist, asked Dr. Isaacs, and as far as the pectoral atrophy is concerned, Mr. Conaway said in candor, that's something I noticed in my early adolescence, age 13. Nothing about neck, shoulder, any sagging of muscle as a result of or after the police incident. He again told Dr. Isaacs, his own neurologist, having been referred by his family doctor, that the symptoms waxed and waned, and he attributed them to a 1994 automobile accident. It was my argument in closing that it was the theme that it was only sometime later that Mr. Conaway saw how he might be able to turn this incident to his advantage. Ironically, when he saw Dr. Zimmerman, a neurosurgeon, at some late date, what was interesting was that there had also been a subsequent automobile accident about five months after the arrest by my clients, and that's a September 98 automobile accident. And the diagnosis was paracentral and lateral recess disc prolapse with spinal cord impingement, the very diagnosis that Dr. Zimmerman later attributed to the incident with my clients. Some of this is detailed at a level that isn't going to be pertinent, you know, except on a particular issue. So if you wouldn't mind, I'd like to rephrase what some of the issues are, and then if you'd comment on that, I'd appreciate it. First of all, in the opening statement, I guess in your opening statement, as I understand Appellant's claim, you referred he's been in a civil rights claim excessive force and you're representing the officers, I guess. And you referred to them going out to enforce a restraining order. So he says that's error. It doesn't. Does the case of Graham v. Conner from the Supreme Court resolve that issue? I think it does, Your Honor. And to put it into context, because, you know, a case isn't tried in a vacuum. You know, the judge said that he was going to look closely at prior bad acts, that he wasn't going to make any hardened, fast rulings. If either side attempts to introduce evidence and an objection is made, he'll make a ruling at that time. And as was pointed out, the plaintiff's attorney, in his opening statement, made some reference to the police responding to a report of a crime. But to answer your question, yes, that case does take care of it because, as was noted a few minutes ago, the severity of the crime is one of the elements that a court looks at in determining the appropriateness of the force used. And it turns out that apparently the report from Ms. Nelson about the violation of restraining order may have been false or she recanted. But in any event, what the police know when they go out there, they've just heard there's a violation of restraining order. So under Graham v. Conner, that, as I understand it, is pertinent to how much force they're allowed to use. That's true, Your Honor. And there was a reference made to, well, it was a false report. But you'll note that we obtained summary judgment on the issue of probable cause. In other words, the officers had no reason to believe when they went out there and made the arrest that there was a false report. And this is important to other issues raised. There would have been no impeachment on the falsity of the report or, better stated, the alleged falsity of the report. What Judge Bloom said was that her guilty plea on what was treated as a violation would not qualify as impeachment of a crime. So that mere smidgen of evidence wouldn't come in for impeachment purposes. But he did say, have at it, if you can find some evidence that she would testify that what she told the officers was false. Her entire deposition testimony is part of the excerpts of record. And she explains why she entered the guilty plea and said it was a matter of expediency because of some things that she had going on, and says in two different locations in her testimony that, nevertheless, in her guilty plea notwithstanding, she saw Mr. Conaway there, and there is no way that they would have been able to contradict her on that point. Okay. How about the issue, I guess, at some point in the questioning, there's an inquiry with Mr. Conaway about whether he was taken to the ground in another arrest in 1999. Okay. I'll address that. Should the defense be able to bring that up at all? It's, it was a shorthand way, well, you'll note that I indicated there in the cross-examination not to belabor this. That was a signal to the judge that we're certainly going to honor the directive not to get into the underlying facts. In other words, in this case, with the February 99 arrest, it had to do, there was charges of drugs and child abuse and so on. So it was a signal that I'm not going to belabor it or get into the underlying facts. But like the automobile accidents, there were several, 94, 98, so on and so forth. There were some arrests. They're saying it was my arrest, my client's arrest of April 98 that caused the problem. It's my position that if, in fact, he had injuries in an arrest, it wasn't mine, it was February 99. And that's as far as that went. And if anyone had said that that's. So if I understand your answer, it is that the issue is relevant potentially to causation of any injury that might be found. Correct, Your Honor. And if there had been any issue raised about, no, that's not accurate, as I say in the brief, I would have been able to develop through Dr. Zimmerman, because that's where the information came from in the first place, is that when he took a history and so on, Mr. Conaway, the plaintiff, had told him that it was in a February 99 arrest when he was taken to the ground that he had neck and shoulder injuries. And that was a preliminary working diagnosis that Dr. Zimmerman had come to. So if we're going to talk about injuries in the course of an arrest, I don't know how else, you know, well, wasn't it in 1999? What does that mean? There was some sledding accidents that he had had, motor vehicle accidents. It's easier to say rather than 94 automobile accidents, a rollover accident. Or the September 98, I think, was like a rear ender or I'm not sure what, but it was a way of delineating with some specificity without going and violating the court's directive not to get into underlying facts, that it was a separate, different police encounter that there may have been some neck and shoulder injury from, not mine of April of 98. It wasn't entirely clear to me, Mr. Mallory, what happened after that. Do I have the impression that there was not a formal objection on the record from the plaintiff's counsel, but that there was some sort of informal conference with the judge? That's correct, Your Honor. And then the following day, the plaintiff's counsel moved for a mistrial, right? And the judge denied it, but gave a curative instruction of some type. You're absolutely right. It was the reference to, not belabor this, but, you know, the February 99 thing was right at the end of one day, and there was a request for a sidebar, and the judge says, in effect, you know, not take this any further, and then the jury is excused, recessed for the day, and then it's the following morning. You're exactly right that he makes this motion, but it wasn't clear, and that's indicated through no other source than Judge Bloom saying, well, if it's the incident of yesterday you're referring to for any kind of a motion that's denied, I'll entertain a curative instruction, and that's when Mr. Plaintiff's counsel says, yes, that's what I'm looking for. Okay. Well, could you shed some light on the problems with Ms. Vicki Nelson getting there? Because that was the most confusing part of what you read in the book. Yes. It was an ugly mess, and that's why I just finally threw up my hands and said forget it. There had been an earlier trial date, and she was living in Portland, and I subpoenaed her for the earlier trial date. She lived and worked in Portland. She was subpoenaed, and then there was an 11th hour cancellation or postponement of the trial at the request of Plaintiff's counsel. So there's a new trial date, and with that approach of a new trial date, I again attempted to subpoena her at the same location where she lived, where she worked, and she's not there. And we have the subpoenas and the no found return from the process server and so on, and so for that reason my fallback position was use portions of her deposition, which she'd been cross-examined by Mr. Glass, and so that was the way it was handled. What we learned through the course of the trial was this is unknown to us. She had moved to Baker City or back to Baker City, and she had had a prior relationship with the plaintiff. She's the mother of the plaintiff's child, and what had happened is we learned later during the course of trial is that he had told her he had a doctor's appointment and he wouldn't be able to look after their child, and so that's what she accepted, and then she's at a restaurant someplace, and she hears something about jury selection, and she realizes, oh, he's not at a doctor's appointment. He's in trial. She somehow is able to get my phone number. She calls my office and learns, in fact, the trial's taking place. She travels the hundred miles from Baker City to Pendleton, has a ride by someone, and we're in the midst of trial. We're watching the doctors, Richards and Isaac's perpetuation video depositions, and the courtroom deputy nudges me, and she has a note. She says, Vicki Nelson's outside. Do you still need her? And whether it was a wise thing to do at the time or not, I said, you know, no, and we continued watching the videos. Then at the end of the day, they point out that she was there, but she's no longer there. The judge says if one side or the other can subpoena her, that would be fine. In the meantime, she'd gone back to Baker City. The storm was right behind her. There was the blizzard. In fact, one of the jurors was hours late because the Oregon State Police had closed the road. In any event, obviously they were able to subpoena her because the plaintiff, you know, by virtue of the relationship with the trial and everything, knew where she was. They subpoenaed her. She calls me at my hotel room in Pendleton, and I said, fine, if you can get here, I'll put you up overnight, and we'll go into court together the next morning. Her only transportation at that time was Greyhound. I find out because she calls me at 7 o'clock the next morning. She says she waited for hours, no bus, the road is closed. I hope she's not in trouble. I say that's not my call to make, but it sounds like, you know, circumstances are such that you've done what you can. And that's basically the way it played out. Eventually the roads opened up, the juror made it, and ironically the witness, Vicki Nelson, called Judge Bloom and said, is she still needed? And he asked us, and by that time you'll see that I had just said this is too ugly, too messy. I'm not going to use her as a live witness. I'm not going to use her deposition. Forget it. And even though they had succeeded in subpoenaing her, they didn't want her testimony. She hadn't been listed as a witness. At that point, did the plaintiff have the opportunity to use subpoena power and bring her in as an adverse witness? They had succeeded in subpoenaing her the night before. Yeah. And how do you deal with the argument by a felon that, well, at that point the judge maybe reversed ground on whether she could be impeached, so now there was no reason to call her or something? He didn't reverse himself. He always stuck to the ruling that the guilty plea was not going to be usable, but they were always free. If they had some ‑‑ if they could get her to say what I told the officer about identifying Sean Conaway as being there in violation of the restraining order, it wasn't on the up and up, but he never reversed himself on that. And as I say, Your Honor, they had no impeachment documents, no sealed documents, and based upon her deposition testimony, she says, notwithstanding her expedient plea to the violation, notwithstanding that, she saw him and would stick by that. So there you are. Thanks, counsel. Your time has expired. Thank you. Mr. Anderson, you have some rebuttal time remaining. Oh, Mr. Glass. I'm Mr. Glass. I have a short rebuttal. I think the key to this case is that when you're trying a case, you have two things going on. You have the facts of the case and you have the facts that the jury believes in. In this case, they were permitted to hear false facts. They were permitted to hear that here was an individual who had allegedly violated or supposedly violated a restraining order, so he must be a violent person. They didn't get to hear the rebuttal, which we were entitled to put on. Whose fault was it? I mean, what was done wrong that prohibited you from getting that rebuttal out there? Why couldn't you bring her in as an adverse witness? Well, we did subpoena her. The judge then ruled that that was a collateral matter. He said in the bottom line, as I argued and we have it in our brief, argued continuously, that, Your Honor, we have the right to bring her in, to have her testify, and I can show her false statement that she made a false statement about the restraining order. I can put on evidence that would show that my client, in fact, was never there, and we have evidence to prove that he was never there. And what the jury has been permitted to do is hear that he was a violent individual, falsely hear that, and then it was compounded by Mr. Mallory's, the way he squeezed it in. He wasn't citing line and verse for the transcript, and suddenly he just worded it out as the last question. He says, Oh, by the way, Mr. Conway, weren't you arrested in 1999 and thrown to the ground by a police officer? And so there again we had evidence allegedly of violation, of bad conduct and violence. The truth of it was, is Mr. Conway was falsely arrested on that occasion. They dropped all the charges. They had made a mistake. So we weren't permitted to do that, which lawfully we should have been permitted to do, and the judge even said, Mr. Glass, I'm going to rule. When I told him why I was under the rules I was entitled to do that, he says, Well, my ruling now is going to be that the prejudicial effect outweighs its probity value. And I argued that was not the law, and as we show in our brief, he had previously ruled the opposite way, saying that it was pertinent, we could get that in, and now he said, Well, it would take too much time to get it in. So he wouldn't let me. So if I had her as a witness, and if I called her as a witness, it would have done me absolutely no good because the judge said, I'm not going to let you go into it. So he permitted the other side to leave the jury with the thought that here was a violent person who the police had to arrest on many occasions, and now he's in crying before the jury and whining and saying, Well, you know, you might think I got my just desserts because I had to be arrested for all this bad conduct, but now I want compensation. What jury is going to compensate me? The record would be a lot clearer. I don't know if this is absolutely necessary. That's what I have to think about. But if you had subpoenaed or brought her there and tried to ask her a question, and then the judge shut you down, then we'd know what question wasn't permitted. But it looks a little bit like you made a strategic decision that you weren't going to call her. No. In the first place, we didn't subpoena her as a witness because, in fact, it was very clear that that was not going to be permitted in. And so I didn't need to put her on for any reason. But counsel, in his opening statement, his own testimony, claims that he violated this restraining order. I wasn't able to point out that the restraining order was only for a child visitation issue. It had nothing to do with violence. The judge wouldn't let me do that either. So strategically, I think I put it on the record, and it's in the brief, that we pointed out all the things that I would do if I brought her in and the questions I would ask. And he says, I'm not going to let you do that. I'm not going to let you ask her about her false statement. I'm not going to let you put in evidence about what the restraining order really was, that it involved only a child issue and it wasn't violence. And so that misrepresentation was presented by the court, by counsel. He knew what the real facts were. He knew the effect. And it was manifest error. And also, it's very unjust because we all know that when the jury hears that, they're going to think this guy deserved what he got, or just deserves, and he's now crying that he should be compensated for the damages that he caused by his own misconduct. None of it's quite directly on point on either side, whether he violated a restraining order or whether he didn't or what the restraining order was. Someone could be a multiple murderer and still make a lawsuit for excessive force if they're arrested the wrong way. But I guess maybe it could affect the jury. So I'll think about all you want. All right. Thank you very much. Thank you, counsel. The case just argued is submitted.
judges: Hall, Graber, Gould